IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

```
------------------------------------------------------   :
EDNA LYBARGER,                         : CASE NO.  1:10 CV 0373
                                       :
                          Plaintiff    :
                                       : MEMORANDUM OF OPINION AND
              -vs-                      : ORDER GRANTING DEFENDANT'S
                                       : MOTION FOR SUMMARY JUDGMENT
                                       :
ROBERT GATES, Secretary of             :
Department of Defense,                 :
                                       :
                         Defendant.    :
------------------------------------------------------
```

UNITED STATES DISTRICT JUDGE LESLEY WELLS


        Plaintiff Edna Lybarger ("Mrs. Lybarger") brought this action pursuant to Title VII

to remedy claims of sexual harassment, retaliation, constructive discharge, and hostile

work environment.  (Doc. 1).  Mrs. Lybarger was employed as an accountant at the

United States Department of Defense, Defense Finance & Accounting Service ("DFAS")

beginning in June 2003, applied for and received a new position as a systems

accountant at DFAS in April 2009, and resigned from that position in June 2010.

Defendant Robert M. Gates, Secretary, United States Department of Defense, DFAS

("Defendant") has now filed a motion for summary judgment, to which there are

responsive pleadings.  (Docs. 29, 32, 36).

        For the reasons set forth below, this Court finds that Mrs. Lybarger's claims may

be dismissed as a matter of law.   Accordingly, this Court will grant Defendant's motion

for summary judgment against Mrs. Lybarger's sexual harassment, retaliation, constructive discharge, and hostile work environment claims.


### I.  BACKGROUND

In June of 2003 Mrs. Lybarger was hired as an Accountant with the DFAS office in Cleveland, Ohio.  Michael Glenn ("Mr. Glenn") became her immediate supervisor in 2006.  Mr. Glenn remained Mrs. Lybarger's immediate supervisor when she was promoted to a Branch Chief in late 2007.  During this period, Mr. Glenn's immediate supervisor was John Luckas ("Mr. Luckas"), and Mr. Luckas reported to Louis Ockunzzi ("Mr. Ockunzzi").

In her deposition, Mrs. Lybarger recounts a May 2006 incident involving Mr. Glenn while the two were part of a transition team with twelve others in Oakland, California staying in the same long term apartment housing complex.  According to Mrs. Lybarger, on at least two occasions Mr. Glenn got into the housing complex's hot tub with Mrs. Lybarger and another female.  Mrs. Lybarger recounts that nothing physical happened, but that Mr. Glenn later in the week commented that he thought the other female was suggesting a "threesome."  Mrs. Lybarger did not discuss this incident with anyone at DFAS.

Mrs. Lybarger further recounts that at a Customer Conference held in Pensacola, Florida in mid 2007, Mr. Glenn asked Mrs. Lybarger to get a drink with him following dinner with the group of attendees.  Mr. Glenn walked with Mrs. Lybarger to a topless strip club.  Mrs. Lybarger recounts she told Mr. Glenn she did not want to be at the club.  The two stayed at the bar a short period, perhaps forty-five minutes, and Mr. Glenn

2

called a taxi to take them both back to the hotel.  Mrs. Lybarger did not recount this incident to the EEO officer at DFAS.

Mrs. Lybarger traveled to San Diego, California in January of 2008 with Mr. Glenn and her co-worker Elaine Ortiz for another transition team conference.  Mrs. Lybarger recounts that on the last day of the conference a group of roughly fifteen co-workers met after work hours at a piano bar where the group put money down on the piano to have co-workers called up to perform lap dances.  Mrs. Lybarger admittedly contributed to a pool of money to have Mr. Glenn called up on stage where he called the Plaintiff up on stage so that he could perform a lap dance while she sat in a chair.  The audience then encouraged Mrs. Lybarger to perform a lap dance while Mr. Glenn sat in a chair.  Mrs. Lybarger performed the lap dance and testified that she was "disgusted" and "embarrassed" by the lap dance.  Photographs taken by co-workers during the evening event, and placed into evidence, show Mrs. Lybarger engaged in the frivolity and laughing while straddling Mr. Glenn.  Mrs. Lybarger did not recount this incident to an EEO officer at DFAS.

During this time period, Mrs. Lybarger recounts that Mr. Glenn also made suggestive comments regarding supervising manager Melissa Sikora ("Ms. Sikora").  Plaintiff refers to Ms. Sikora as her mentor.  The Plaintiff asserts that Mr. Glenn repeatedly joked about Ms. Sikora's sex life and about her attire.  Mrs. Lybarger testified that she eventually, in the September to October 2008 time frame, spoke with Ms. Sikora regarding Mr. Glenn's comments toward Ms Sikora, and the incidents involving the lap dance and the strip club.  (157-163).  Mrs. Lybarger recounts that she told Ms. Sikora about these events in "bits and pieces" over a two month period.  (157-58).  In

3

her EEO declaration, Ms. Sikora declared that the Plaintiff first made her aware of allegations concerning Mr. Glenn on 7 September 2008.  (Doc. 36, Ex. 1, Dec. Sikora p. 3).  Of Ms. Lybarger's allegations, Ms. Sikora recounts: "According to her Mr. Glenn talked unfavorably about me and directed her not to socialize with me.  I advised her that if our friendship/Mentor relationship was causing her distress at work, we could end our friendship/Mentor relationship.  I also advised Ms. Lybarger to inform her chain of command, which she repeatedly refused to do and requested that I not inform them either."  Id.

Mrs. Lybarger testified to a series of incidents in which she spoke with Mr. Luckas and Mr. Ockunzzi, Mr. Glenn's first and second line supervisors, regarding work responsibilities and regarding Mr. Glenn's insistence that she not go "over his head" and talk to his supervisors.  (Dep. 167, 177-90).  Both Mr. Luckas and Mr. Ockunzzi encouraged her to come and talk to them whenever she wished.  The Plaintiff recounted that Mr. Glenn was upset when he found out that she had been speaking with his supervisors.

Mrs. Lybarger received her performance evaluation on 19 December 2008.  The Plaintiff received an overall performance rating of "3", a "fully successful" evaluation, that consisted of two ratings of "4" and two ratings of "3" creating an overall average of 3.5, which was then rounded down to an overall rating of "3".  (Luckas Dec., Ex. 1). After a heated exchange with Mr. Glenn, Mrs. Lybarger spoke with Anna Vedouras

4

("Ms. Vedouras") of Human Resources concerning her evaluation.[1]  (Dep. 186-193).

Mrs. Lybarger testified in her deposition that the evaluation was personal, that Mr.

Glenn had downgraded her evaluation because the Plaintiff was "standing up to him"

and "not doing things that he expected of me that were not my job."  (Dep. 191).  While

Mrs. Lybarger is uncertain whether she discussed specifics with Ms. Vedouras

regarding Mr. Glenn's alleged behavior, she is certain that she said something about

sexual harassment in her conversation.  (Dep. 192).  At the time of her evaluation from

Mr. Glenn, 19 December 2008, he was no longer Mrs. Lybarger's supervisor.  Several

months prior,  Mr. Luckas had switched Mr. Glenn's and supervisor Sherlene Morihisa's

positions as Division Directors to "further develop their careers and grow as leaders"

(Luckas Dec. ¶ 10).  As of the time of her evaluation as a "Valued Performer" from Mr.

Glenn, Mrs. Lybarger reported directly to Ms. Morihisa.

Mrs. Lybarger was advised to speak with an EEO officer and, on 22 December

2008, she spoke with Joe Bradley ("Mr. Bradley"), EEO Specialist.  On 5 January 2009,

Mrs. Lybarger met with Mr. Bradley and Mr. Luckas to discuss her "fear" of working with

Mr. Glenn and her desire not to work in any part of the Celebrezze Federal Building

because of Mr. Glenn's presence.  (Luckas Dec., ¶ 13; Ockunzzi Dec. ¶¶ 7, 13).  When

asked what allegations she discussed at this meeting Mrs. Lybarger replied in

testimony:

> . . . the threat of my performance appraisal and retribution and why all
> these times that people had said why don't you tell anybody, because this

---

[1]On Ms. Vedouras' suggestion, Mrs. Lybarger appealed her evaluation through the standard reconsideration process and her evaluation on one of her performance elements was changed from a '3' to a '4', moving Plaintiff's rounded up evaluation score to a'4'.

is exactly what happened, everything I was afraid of. . . . Because Mike is
a scary person, because I've not come forward and he's going to know
and he's an unstable, angry person.

(Dep. 202-03).  Aside from being afraid of the threat of her performance evaluation from

Mr. Glenn, Mrs. Lybarger was unable to identify what, specifically, caused her fear of

Mr. Glenn, or required that she work separately from Mr. Glenn.  Mr. Bradley advised

Mrs. Lybarger and Mr. Glenn be separated.

On 6 January 2009, Mrs. Lybarger was advised by Mr. Ockunzzi that she should

"telework" from home while an internal management investigation was conducted.

"Telework" was a common practice at DFAS.  While Mrs. Lybarger testified that she was

advised that the investigation would take approximately five days (Dep. 203-04), the

Plaintiff told her psychiatrist that she would be on "telework" for six weeks during the

course of the investigation.  (Doc. 35, Deposition of Nan Nelson, M.D., p.91 filed under

Seal).  During this period, Mr. Ockunzzi attempted to place Mrs. Lybarger into another

suitable DFAS position.  (Ockunzzi Dec., ¶¶ 12-15).

Mrs. Lybarger maintains that during her "telework" period she was not allowed to

attend several training classes and social events, to her detriment.  Mr. Luckas testified

that Mrs. Lybarger was not prevented from attending the annual holiday outing (Dec. ¶

16), and that DFAS management did accommodate Mrs. Lybarger's attendance at the

Business Activity Monitoring Testing by preventing Mr. Glenn from attending.  (Dec. ¶

17).  Mrs. Lybarger did not attend the Lean6 Training class scheduled for February 3-5

2009, as Mr. Glenn was also attending.  Mr. Luckas suggested Mrs. Lybarger pick

another session as she had the opportunity to attend the Lean6 training at a later date

6

and the delay did not affect her pay, benefits, workplace duties, or career development. (Luckas Dec. ¶ 19).

In February 2009, through her attorney, Mrs. Lybarger notified the Defendant that she wanted to return to work.  Mr. Ockunzzi advised she could return to work the day after President's Day in February 2009, where she would continue to report to her supervisor Sherlene Morihisa.  The Plaintiff's former supervisor, Mr. Glenn, continued to work out of his same office in the Celebrezze Building.

In March 2009, Mrs. Lybarger applied for a new position as a systems accountant at DFAS.  That position represented a promotion in pay and in grade and was not located in the Celebrezze Building.  The job announcement indicated that travel was required to Annapolis, Maryland in order to test a new Navy system.  Mrs. Lybarger's  then current job had also required travel, involving, at one point, a three month stay in Charleston, South Carolina.  In April 2009, Mrs. Lybarger accepted the position where her immediate supervisor was Carl Inman.  Neither Mr. Ockunzzi nor Mr. Luckas were in the supervisory chain of command.  The Plaintiff recounts that she was under the impression that the travel required, which involved weekdays in Annapolis and weekends in Cleveland would end in December 2009, but the date for finishing the Naval project kept being extended.  (Dep. 109-119).  The Plaintiff testifies that when she was left with the impression that the travel would continue indefinitely she resigned her position in June 2010.  Id.  The Plaintiff did not attempt to find another job with DFAS as she "wasn't going to take a position that I was going to be near Mike Glenn."  (Dep. 114).  Mrs. Lybarger claims that she has had to seek treatment for severe depression

7

and other emotional damages as a result of the alleged ongoing sexual harassment and her alleged constructive discharge from Defendant.  (Dep. 247-49).

Mrs. Lybarger filed the instant matter on 18 February 2010 and submitted her First Amended Complaint on 26 August 2010.  (Doc. 16, First Amended Complaint). Plaintiff asserts three claims.  In Count I, Mrs. Lybarger charges a violation of Title VII Sex Discrimination, asserting that "[a]s a result of the above-mentioned comments and conduct of . . . Michael Glenn, Mrs. Lybarger was subjected to sexual discrimination through the comments and actions of Glenn directed towards her, as well as comments with respect to another woman with whom she worked, as well as Glenn's treatment of her which differed from other similarly situated individuals."  (Amended Complaint, ¶ 22).  Mrs. Lybarger further asserted that she "suffered adverse employment actions, including, but not limited to, decrease of her 2008 performance appraisal, removal from her previous position, which resulted in her losing various wages and benefits, which ultimately also led to her constructive discharge."  (Amended Complaint, ¶ 23).

Mrs. Lybarger also brings a charge of "Retaliation and Discharge" in Count II of her Amended Complaint, where she asserts that her "complaints about the conduct of Glenn constituted protected activity under Title VII" (Doc. 16, ¶ 26) and that "[a]s a direct and proximate result of Mrs. Lybarger's protected activity, Mrs. Lybarger's 2008 performance appraisal was decreased, she was removed from her normal work environment and asked to telework from home, which actions on the part of Defendant constitute retaliation as that term is defined under Title VII."  (Doc. 16, ¶ 27).  Mrs. Lybarger contends these actions caused her to forfeit "job opportunities, training, information, . . . and which eventually resulted in her constructive discharge from the

8

employment of defendant."  (Doc. 16, ¶ 28).  The Plaintiff charges that she "was effectively discharged form her position as an Accountant from her complaints of the actions and conduct of Glenn, which actions and conduct by Defendant in removing her from her normal working environment and in causing her to seek employment at a facility located in the State of Maryland and which ultimately resulted in her constructive discharge, constitutes a retaliatory discharge in violation of Title VII."  (Doc. 16, ¶ 29).

Mrs. Lybarger also brings a charge of "Hostile Work Environment" in Count III of her Amended Complaint.  The Plaintiff asserts that she was "subjected to demeaning comments, actions and harassment on the part of Defendant's employee/agent/supervisor, Michael Glenn, which comments were motivated by sexual discrimination and animus."  (Doc. 16, ¶ 32).  Mrs. Lybarger further asserts that "[t]he actions and inactions of Defendant, through its agents and employees, were unwelcome by Mrs. Lybarger and were sufficiently severe and pervasive to create a hostile work environment, which . . . unreasonably interfered with her work environment and other terms and conditions of employment."  (Doc. 16, ¶ 33).

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The moving party:

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together

9

> with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Id. at 323;  see also  Boretti v. Wiscomb, 930 F.2d 1150, 1156 (6th Cir.1991) (moving party has the "burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the nonmoving party, do not raise a genuine issue of material fact for trial") (quoting Gutierrez v. Lynch, 826 F.2d 1534, 1536 (6th Cir.1987)).  The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986) (quoting Fed.R.Civ.P. 56(e)).  Thus, "[o]nce the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial."  Talley v. Bravo Pitino Restaurant, Ltd., 61 F.3d 1241, 1245 (6th Cir.1995).  Read together, Liberty Lobby and Celotex stand for the proposition that a party may move for summary judgment by demonstrating that the opposing party will not be able to produce sufficient evidence at trial to withstand a motion for judgment as a matter of law pursuant to Fed.R.Civ.P. 50. Street v. J.C. Bradford & Co., 886 F.2d 1472, 1478 (6th Cir.1989).

Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations.  It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); see also Michigan Protection and Advocacy Serv., Inc. v. Babin, 18 F.3d 337, 341 (6th Cir.1994) (marking as standard that the plaintiff must present "more than a scintilla of

10

evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff").  Rather, Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position.  Celotex Corp., 477 U.S. at 324.  Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Summary judgment shall be denied "[i]f there are . . .  'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'"  Hancock v. Dodson, 958 F.2d 1367, 1374 (6th Cir.1992) (citation omitted).

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of his case.  Tolton v. American Biodyne, Inc., 48 F.3d 937, 941 (6th Cir. 1995) (citing Celotex, 477 U.S. at 322).  Accordingly, "the mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  Copeland v. Machulis, 57 F.3d 476, 479 (6th Cir. 1995) (quoting Anderson, 477 U.S. at 52 (1986)).  Moreover, if the evidence is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment.  Anderson, 477 U.S. at 249-50 (citation omitted).

III.     LAW AND ANALYSIS

A. Failure to Exhaust the Constructive Discharge Claim

11

As a threshold matter, the Defendant maintains Mrs. Lybarger failed to exhaust her administrative remedies as they pertain to her June 2010 constructive discharge. The Defendant contends the constructive discharge was both too distant in time from the 2008 and 2009 claims, and that the constructive discharge embodied discrete events and separate theories of liability.  As the Defendant notes, the constructive discharge in this instance did not occur until long after the EEO investigation was complete, the agency had issued its final agency decision, and Mrs. Lybarger had filed the instant matter in federal court.  (Doc. 1, Complaint, ¶ 6).  Mrs. Lybarger opposes this reading of events, maintaining instead that her constructive discharge was an extension of her charge of retaliation.  Further, Mrs. Lybarger contends that her constructive discharge claim and her retaliation claim emerge from the same constellation of facts. Finally, Mrs. Lybarger urges the application of a version of the continuing violation doctrine that would recognize her June 2010 alleged constructive discharge as  the final act of retaliation, the fruition of the January 2009 suggestion that the Plaintiff perform her DFAS duties by teleworking from home.

"In permitting federal employees to sue under Title VII, Congress conditioned the government's waiver of sovereign immunity upon a plaintiff's satisfaction of 'rigorous administrative exhaustion requirements and time limitations.' " McFarland v. Henderson, 307 F.3d 402, 406 (6th Cir. 2002) (quoting Brown v. Gen. Servs. Admin., 425 U.S. 820, 833 (1976)).  Accordingly, prior to bringing suit under Title VII, a federal government employee must first timely exhaust all administrative remedies.  Benford v. Frank, 943 F.2d 609, 612 (6th Cir. 1991) ("The right to bring an action under Title VII regarding equal employment in the federal government is predicated upon the timely

12

exhaustion of administrative remedies ...").  Specifically, federal regulations require that the aggrieved employee first consult with a counselor at the relevant agency's EEO Office within 45 days of the alleged discriminatory act.  29 C.F.R. § 1614.105(a)(1).  If the matter is not resolved after a mandatory counseling period, the employee may then file a formal written administrative complaint ("EEO complaint") within 15 days of receipt of the EEO counselor's notice of final interview and right to file a formal complaint ("EEO notice").  Id. at § 1614.106(a), (b).  Upon notice of a final agency decision, the employee may file a civil action within 90 days of the notice or after 180 days from the filing of the EEO complaint if the agency has not yet rendered a decision.  42 U.S.C. § 2000e-16(c).  Despite the statutory rigidity, Title VII's exhaustion requirements "are subject to waiver, estoppel, and equitable tolling."  Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 393 (1982).

       In designating the procedure for challenging prohibited employment discrimination under Title VII, Congress gave initial enforcement responsibility to the EEOC.  Thus, an employee alleging employment discrimination in violation of the statute must first file an administrative charge with the EEOC within a certain time after the alleged wrongful act or acts.  See 42 U.S.C. § 2000e-5(e)(1).  The charge must be "sufficiently precise to identify the parties, and to describe generally the action or practices complained of." 29 C.F.R. § 1601.12(b).  As a general rule, a Title VII plaintiff cannot bring claims in a lawsuit that were not included in her EEOC charge. See 42 U.S.C. § 2000e-5(f)(1); Alexander v. Gardner-Denver Co., 415 U.S. 36, 47, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974).  This rule serves the dual purpose of giving the employer information concerning the conduct about which the employee complains, as well as

13

affording the EEOC and the employer an opportunity to settle the dispute through conference, conciliation, and persuasion.  See id. at 44, 94 S.Ct. 1011.  Allowing a Title VII action to encompass claims outside the reach of the EEOC charges would deprive the charged party of notice and would frustrate the EEOC's investigatory and conciliatory role.

A court's jurisdiction is "limited to the scope of the EEOC investigation reasonably expected to grow out of the charge of discrimination." Ang v. Procter & Gamble Co., 932 F.2d 540, 545 (6th Cir. 1991).  Therefore, a plaintiff may bring suit on an uncharged claim if it was reasonably within the scope of the charge filed.  Davis v. Sodexho, Cumberland Coll. Cafeteria, 157 F.3d 460, 463 (6th Cir. 1998) ("[W]here facts related with respect to the charged claim would prompt the EEOC to investigate a different, uncharged claim, the plaintiff is not precluded from bringing suit on that claim.").  Courts also consider an uncharged claim exhausted if the relevant agency discovers evidence of the discrimination underlying the uncharged claim during their investigation into the plaintiff's charge.  Id.

The Sixth Circuit interprets the scope of a charge liberally where the plaintiff was not assisted by counsel in drafting the charge.  "Liberal construction is not necessary where the claimant is aided by counsel in preparing his charge."  Ang, 932 F.2d at 546.  However, that "does not mean that a broad reading may not, or should not, be given in cases where a plaintiff has counsel."  Cleveland Branch, N.A.A.C.P., 263 F.3d at 536. In this instance, Mrs. Lybarger was assisted by counsel in the preparation of her charge of discrimination.

14

The "scope of investigation" doctrine provides that "the judicial complaint must be limited to the scope of the EEOC investigation reasonably expected to grow out of the charge of discrimination." Tisdale v. Fed. Express Corp., 415 F.3d 516, 527 (6th Cir. 2005).  Further, "where facts related with respect to the charged claim would prompt the EEOC to investigate a different, uncharged claim, the plaintiff is not precluded from bringing suit on that claim." Id. (quoting Davis v. Sodexho, 157 F.3d 460, 463 (6th Cir. 1998)).

The focus of the "scope of investigation" doctrine, then, is on whether the later charged claim would naturally have been investigated as a part of the EEOC investigation of the originally charged claim.  Recognizing this, courts have refused to accommodate claims for allegedly adverse actions that occurred after the completion of the subject EEOC investigation since, as a practical matter, the facts related to the later claim would never have been investigated, as part of the original process since they had not yet occurred. Clockedile v. New Hampshire Dep't of Corr., 245 F. 3d 1, 5 (1st Cir. 2001) ( "It is a stretch to describe acts that occurred after agency proceedings have ended ... as [being] 'within' the scope of the agency investigation."); Schaefer v. United States Postal Serv., 254 F.Supp.2d 741, 752 (S.D. Ohio  2002) (determining that plaintiff had failed to exhaust administrative remedies, as to claims of suspension and discharge, because facts relevant to those claims happened after plaintiff received right to sue letter, which was generated as a result of EEO Complaint).

In this instance, the facts support the Defendant's contention that this Court is without jurisdiction to entertain the alleged constructive discharge claim. The Plaintiff filed her informal EEO Complaint on 11 March 2009 and a formal EEO complaint on 27

15

March 2009, she received her notice of rights on 1 September 2009, followed by the final agency decision on 24 November 2009.  The EEO Complaint obviously did not assert a claim pertaining to the Plaintiff's alleged constructive discharge, since the Plaintiff had not yet even accepted the new DFAS systems accountant job, and she had not resigned her position until more than six months after the EEO final agency decision.  Mrs. Lybarger applied for this new position, a promotion in pay and grade, in March and accepted the position in April 2009.   In June 2010, the Plaintiff submitted her resignation, testifying later that she resigned as a result of the difficulties involved in the job's travel requirements.  (Dep. 118-19).  The facts and circumstances of Mrs. Lybarger's resignation are at a distinct remove from those asserted in her EEO claim, as at the time of her resignation the Plaintiff held a different position, reported to a different supervisor along a different supervisory chain, and was working in a different building.

As a corollary, the distinct remove of Mrs. Lybarger's June 2010 resignation from her December 2008 retaliation claim works against the Plaintiff's argument that the constructive discharge was a continuing effect of that alleged retaliation.  (Doc. 32, p. 13).  This Circuit recognizes that a continuing violation "is occasioned by continual unlawful acts, not continual ill effects from an original violation."  Eidson v. State of Tenn. Dep't of Children's Servs., 510 F.3d 631, 635 (6th Cir. 2007).  The Court does not find that the circumstances surrounding Mrs. Lybarger's decision to resign her position warrants the application of the continuing violation doctrine.  There were, simply, no continual unlawful acts with regard to the new position accepted by Mrs. Lybarger.

Because the alleged constructive discharge, in the present case, did not happen until after the EEOC had taken final action on the Plaintiff's 2009 EEO Complaint, the

facts pertaining to the discharge do not fall within the "scope of investigation" exception

to the exhaustion rule. Therefore, the Defendant's Motion for Summary Judgment, as to

the Plaintiff's constructive discharge claim, will be granted for failure to exhaust

administrative remedies.[2]


### B.  Failure to Exhaust Claims Related to Events Prior to the End of Mrs. Lybarger's Performance Period – October 2008.

Defendant further argues, as a threshold matter, that Mrs. Lybarger's claims

cannot be augmented by certain alleged events that occurred from 2006 until January

2008, that are neither mentioned in the Plaintiff's First Amended Complaint nor

presented in her extensive EEO complaint.  Defendant argues these claims include an

alleged 2006 hot tub incident; a mid-2007 incident at a strip club; an undated statement

about Ms. Sikora's sex life; an undated incident in which Mr. Glenn allegedly looked

down Plaintiff's shirt; a January 2008 incident at a piano bar; an undated remark about a

woman named "Lea"; and a January 2008 incident in which Mr. Glenn allegedly placed

his arm around the Plaintiff.  (Doc. 36 p. 5).

Proper exhaustion of administrative remedies in this EEO context requires the

Plaintiff to contact an EEO counselor within 45 days of an alleged discriminatory

---

[2]Even if the Court were to consider the evidence of the Plaintiff's June 2010 resignation, her departure does not amount to a constructive discharge which requires a finding that working conditions were so intolerable that a reasonable person in the plaintiff's shoes would feel compelled to resign.  Smith v. Henderson, 376 F.3d 529, 533-34 (6th Cir. 2004).  Plaintiff's new position, which she accepted after voluntarily applying, represented a promotion in pay and grade, did not involve Mr. Glenn in a supervisory capacity, allowed her to work in a building separate from Mr. Glenn and, upon resignation, Mrs. Lybarger made no allegation of harassment or retaliation in the new position.  Her testimony indicated only that she did not like the travel component of the position, an element of the job of which she was explicitly aware when she applied.

incident.  By Mrs. Lybarger's own admission, none of the above listed alleged events were reported within the necessary limitations period.  (Lybarger Dep. pp. 31-38; 52-53; 103-04; 133-40).  As such, they are not properly before the Court and may not be considered.  Sutherland v. Shinseki, 2012 WL 423780 (S.D. Ohio 9 February 2012).

Mrs. Lybarger's invocation of the continuing violation doctrine to include these events outside of the required reporting period is to no avail.  As the United States Supreme Court recognized, when an employee seeks redress for discrete acts of alleged discrimination or retaliation, the continuing violation doctrine may not be invoked to allow recovery for acts that occurred outside the filing period.  National Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 122 S.Ct. 2061, 2072 (2002) ([D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges.  Each discrete discriminatory act starts a new clock for filing charges alleging that act).

While Plaintiff may not maintain a claim of retaliation based on discrete acts which occurred more than 45-days before her March 2009 EEO complaint, events prior to this date may be actionable as part of her hostile work environment claim.  In Morgan, the United States Supreme Court recognized that "[h]ostile work environment claims are different in kind from discrete acts" because the "very nature" of a hostile work environment "involves repeated conduct."  Morgan, 536 U.S. 101, 114 (2002).  In contrast to discrete acts, the unlawful employment practice comprising a hostile work environment claim "occurs over a series of days or perhaps years and ... a single act of harassment may not be actionable on its own."  Id. at 115, 122 S.Ct. at 2073.  Accordingly, the Supreme Court concluded that "[a] charge alleging a hostile work

18

environment claim . . . will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period."  Id. at 122.

In making this determination, Morgan directs the Court to consider "whether the acts about which an employee complains are part of the same actionable hostile work environment practice, and if so, whether any act falls within the statutory time period. " Morgan, 536 U.S. at 120.  However, where, as here, the First Amended Complaint asserts only claims arising from events that allegedly occurred from January 2008 forward, the Plaintiff cannot avail herself of the Morgan standard.  Fed. R. Civ. P. 8(a). In application, as courts look to determine what constitutes the "same unlawful employment practice" courts consider acts that are similar in nature, frequency and severity.  Jenkins v. Mabus, 646 F.3d 1023, 1027 (8th Cir. 2011) (concluding that conduct not similar in nature, frequency, and severity are not part of the same unlawful employment practice).

In this instance, events that occurred during the acceptable limitations period between October 2008 and March 2009, included Mrs. Lybarger's performance review and her placement on telework.  Those events are markedly different from the alleged piano bar incident, falling outside the limitations period in January 2008.  Accordingly, the Court will find the Plaintiff failed to administratively exhaust those alleged events falling outside of the limitations period and markedly distinct from those alleged events complained of that fall within the limitations period.

19

### C.  Failure to Make a <u>Prima Facie</u> Case for Gender Discrimination

Each of Plaintiff's claims will be evaluated under the three-part burden shifting framework established in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). Under the first step, the plaintiff bears the initial burden of establishing a <u>prima facie</u> case by a preponderance of the evidence.  See <u>McDonnell Douglas</u>, 411 at 802; <u>White v. Baxter Healthcare Corp.</u>, 533 F.3d 381, 391 (6th Cir. 2008).  By establishing a <u>prima facie</u> case, the plaintiff creates a rebuttable presumption that the employer unlawfully discriminated against her.  <u>EEOC v. Avery Dennison Corp.</u>, 104 F.3d 838, 861 (6th Cir. 1997).  Once a plaintiff has made a <u>prima facie</u> case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the decision.  <u>McDonnell Douglas</u>, 411 U.S. at 802.  If the defendant meets this burden, then the presumption created from the <u>prima facie</u> case drops out and plaintiff has "an opportunity to prove ... that the proffered reasons were not the true reason for the employment decision, but were a pretext for discrimination."  <u>Texas Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 248 (1981).[3]

_____

[3]The Court does not directly reach the issue of pretext as it finds the Plaintiff has failed to demonstrate a <u>prima facie</u> case for each of her claims.  However, it is worth noting that as regards the allegations of telework, performance evaluation, and constructive discharge, the Defendant has presented legitimate, non-discriminatory reasons for its actions that have not been shown to be pretextual. Defendant has presented a legitimate, nondiscriminatory basis for Plaintiff's telework assignment.  <u>Wright v. Murray Guard, Inc.</u>, 455 F.3d 702, 706 (6th Cir. 2006). Defendant has done so by asserting that placing the Plaintiff on telework ensured her comfort and safety while the investigation into her allegations proceeded.  Defendant also presented a legitimate, nondiscriminatory basis for Plaintiff's satisfactory performance evaluation as reflecting her supervisory skills and internal controls she had yet to put in place in the branch she supervised.  (Doc. 33, Glenn Dep. pp. 86-92).  Plaintiff's alleged constructive discharge involved her voluntary resignation due to travel constraints, was remote in time and circumstance from the Plaintiff's initial EEO complaint, and did not involve an action by the Defendant.

Absent direct evidence, to establish a <u>prima facie</u> case of unlawful gender discrimination, a plaintiff must show: (1) she is female, (2) she was subjected to an adverse employment decision, (3) she was qualified for her position, and (4) she was replaced by a person outside the protected class, or similarly situated non-protected employees were treated more favorably. <u>Lyons v. Metropolitan Government of Nashville and Davidson County</u>, 416 F. Appx. 483 (6th Cir. 2011) (citations omitted).

Defendant maintains that Mrs. Lybarger has not stated a <u>prima facie</u> case of gender discrimination under Title VII because she has not met the second and fourth elements of the required proof.  Namely, Defendant contends Mrs. Lybarger was not subject to an adverse employment action, and has failed to identify a similarly situated non-protected employee who was treated differently from the Plaintiff.  Mrs. Lybarger maintains, in opposition, that the employer's decision to have her telework from home was a significant change in her employment status.

As this Circuit has recognized, regarding the second required factor of the gender discrimination <u>prima facie</u> case, an adverse employment action is "a materially adverse change in the terms and conditions of [a plaintiff's] employment."  <u>Spees v. James Marine, Inc.</u>, 617 F.3d 380, 391 (6th Cir. 2010) (quoting <u>White v. Burlington N. & Santa Fe. Ry. Co.</u>, 364 (6th Cir. 2004) (en banc).  The Court in <u>Spees</u> further determined that, "[a] "bruised ego" or a "mere inconvenience or an alteration of job responsibilities" is not sufficient to constitute an adverse employment action.  Adverse employment actions are typically marked by a "significant change in employment status," including "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.""  <u>Spees</u>, 617 F3d at 391 (quoting

21

White v. Burlington N. & Santa Fe Ry. Co., 364 F. 3d 789, 797, 798 & Burlington Indus.
v. Ellerth, 524 U.S. 742, 761,(1998)).

      In this instance, the decision to place Mrs. Lybarger on telework does not rise to
the status of an adverse employment action sufficient to satisfy the prima facie case of
gender discrimination.  The Plaintiff did not have a material change of responsibilities.
Her pay and benefits remained the same.  The Plaintiff has testified that the telework
arrangement caused her to miss a training session and a supervisory forum held during
that six-week telework period.  However, this Circuit has not recognized such
deprivation as an adverse employment action.  See Vaughn v. Louisville Water Co., 302
F. App'x 337, 345 (6th Cir. 2008).

      Nor does it amount to an adverse employment action, as the Plaintiff contends,
to be subject to a performance evaluation that is fully satisfactory and does not
materially affect her pay and benefits but is, rather, a performance score less than she
had expected.  (Amended Complaint, ¶ 23).  See Halfacre v. Home Depot U.S.A., Inc.,
221 F. App'x 424, 433 (6th Cir. 2007).  Finally, the Plaintiff's position that her "removal
from her previous position" was an adverse employment action (Amended Complaint, ¶
23) cannot be sustained in the face of the uncontroverted facts that Mrs. Lybarger
sought a transfer from the Celebrezze Building and voluntarily applied for her new
position which represented an increase in pay and grade.

      As to the fourth factor in the prima facie case, the Court has before it no material
evidence of a similarly situated non-protected employee.  The employee proffered by
the Plaintiff, branch chief Elaine Ortiz, who received a rating of 4 on her 2008 evaluation
from Mr. Glenn, does not meet the requirements of the fourth factor of the prima facie

case.  Younis v. Pinnacle Airlines, Inc., 610 F.3d 359, 363 (6th Cir. 2010) (similarly situated employee must be from "outside the protected class").

### D.  Failure to Make a Prima Facie Case for Retaliation

Defendant, next, maintains Mrs. Lybarger has, as a matter of law, failed to establish a prima facie case of retaliation.

In order to establish a prima facie case of retaliation, the plaintiff must show that: (1) she engaged in activity protected under Title VII; (2) the defendant knew that she engaged in the protected activity; (3) the defendant subsequently took an adverse, retaliatory action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) the protected activity and the adverse action were causally connected.  Smith v. City of Salem, 378 F. 3d 566, 570 (6th Cir. 2004); see also Burlington N. & Santa Fe Ry. Co., 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006).

The threshold question in this instance is whether Mrs. Lybarger engaged in protected activity, the first of the prima facie retaliation factors.  The Plaintiff asserts that she complained about Mr. Glenn's conduct on several occasions to Mr. Luckas and Mr. Ockunzzi.  She also contends in her brief in opposition to the motion for summary judgment that she told Ms. Sikora she was being sexually harassed by Mr. Glenn. (Doc. 32, pp. 20-21).  For any complaint to amount to "protected activity," in this context, the complaint must be one that concerns "discrimination made unlawful by Title VII" such as gender discrimination.  Barrett v. Whirlpool Corp., 556 F.3d 502, 520 (6th Cir. 2009).  Conversely, complaints about business methods or procedures, or unfair

23

treatment in general do not amount to protected activity if they do not specifically address discrimination.  See Philip v. Wrigley Mfg. Co., 2010 WL 4318880 (E.D. Tenn. 22 Oct. 2010).

A thorough review of Mrs. Lybarger's deposition in this matter indicates that she did not specifically discuss sexual harassment with either Mr. Luckas or Mr. Ockunzzi. Instead, Mrs. Lybarger's complaints specifically involved work load issues, chain of command issues, and performance evaluation issues.  Those complaints do not constitute protected activity and, as such, cannot provide a basis upon which to promulgate a prima facie case of retaliation.

Mrs. Lybarger does assert that she complained to Ms. Sikora that Mr. Glenn was sexually harassing her.  However, the Plaintiff's deposition testimony is less than clear on that score.  (Dep. 157-58).  Further, Ms. Sikora's sworn EEO declaration indicates that the Plaintiff's complaints were directed not at any alleged incidents of sexual harassment but, instead, at Mr. Glenn's insistence that Mrs. Lybarger not socialize with Ms. Sikora or other members of management.  (Doc. 36, Exh. 1, Sikora EEO Dec.). Further, both Mr. Ockunzzi and Mr. Luckas provide sworn testimony that Ms. Sikora contacted each of them with the Plaintiff's only concerns revolving around Mr. Glenn's efforts to restrict her access to management, and that the Plaintiff's conversations with managers above Mr. Glenn might jeopardize her performance rating.  (Ockunzzi Dep. p. 21-23; Luckas EEO Aff. ).  Without presenting corroborating evidence aside from the Plaintiff's own inconclusive testimony, Mrs. Lybarger has not raised sufficient questions of fact regarding her alleged statements to Ms. Sikora to overcome the motion for summary judgment.  See Hrometz v. Local 550 Intern. Ass'n., of Bridge Const. &

24

Ornamental Iron Workers,135 Fed.Appx. 787, 791 (6th Cir. 2005); Celotex Corp. V. Catrett, 477 U.S. at 2553-54.

To successfully prove a prima facie case of retaliation, Mrs. Lybarger must also show that she suffered an adverse action as a result of her protected activity. The Plaintiff maintains that her placement on telework constituted just such a materially adverse action. The Court has already recognized that the Plaintiff's placement on telework did not affect her pay, benefits, or responsibilities. In the retaliation context, "[a] plaintiff must show that a reasonable employee would have found the challenged action materially adverse," as an action that would dissuade a reasonable worker from making or supporting a charge of discrimination. Burlington N. & Santa Fe. Ry. V. White, 548 U.S. 53, 71 (2006).

The evidence before the Court indicates that teleworking was common at DFAS, held no stigma for employees, and was not perceived to be invoked as the result of a disciplinary action. (Luckas Dec., ¶ 8; Ockunzzi Dec., ¶ 7). While the Plaintiff did miss a training session and supervisory forum during this telework period, these did not materially affect the Plaintiff's growth advancement or compensation. See Blackburn v. Shelby Cnty., Tenn., 770 F.Supp. 2d 896, 926 (W.D. Tenn. 2011).

Accordingly, as the Plaintiff has failed to prove her prima facie case, the Court will find the Defendant is entitled to summary judgment on the Plaintiff's retaliation claim.

### E. Failure to Prove a prima facie case of Hostile Work Environment

25

Under Title VII, in order to make out a hostile-work-environment claim based on circumstantial evidence of sexual harassment, an employee must show that: (1) she was a member of a protected class; (2) she was subjected to unwelcome sexual harassment; (3) the harassment complained of was based on sex; (4) the charged sexual harassment created a hostile work environment; and (5) the employer is liable. Hafford v. Seidner, 183 F. 3d 506, 512 (6th Cir. 1999) ("'The elements and burden of proof are the same, regardless of the discrimination context in which the claim arises.'" (quoting Crawford v. Medina Gen'l Hosp., 96 F.3d 830, 834 (6th Cir.1996))).  A hostile work environment occurs "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (internal quotation marks and citation omitted).  Both an objective and subjective test must be met; in other words, the conduct must be so severe or pervasive as to constitute a hostile or abusive working environment both to the reasonable person and the actual victim.  Id. at 21-22, 114 S.Ct. 367.

Rather than considering each event complained of in isolation, courts must consider the totality of the circumstances in determining whether the harassment was sufficiently severe and pervasive.  Black v. Zaring Homes, Inc., 104 F.3d 822, 826 (6th Cir. 1997).  Specifically, Courts must consider "the frequency of the discriminatory conduct; its severity; whether it [was] physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfere[d] with an employee's performance."  Harris, 510 U.S. at 23, 114 S.Ct. 367.  "[S]imple teasing, offhand

26

comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment."  Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (internal quotation marks and citation omitted).

Defendant maintains that, viewing the evidence in the light most favorable to the Plaintiff, the alleged conduct was not sufficiently severe and pervasive to create an abusive working environment on the basis of sexual harassment.  Further, Defendant contends the alleged incidents complained of by the Plaintiff do not amount to a hostile work environment because they are unrelated to discrimination prohibited by Title VII but, rather, reflect workplace conflict involving performance review, chain of command, and workload issues.

As this Circuit has recognized in Hawkins v. Anheuser-Busch, Inc., 517 F.3d 321, 334 (6th Cir. 2008), in discussing the considerations attendant upon a determination of the standard of "sufficiently severe or pervasive":

> The determination of whether harassing conduct is sufficiently severe or pervasive to establish a hostile work environment is not susceptible to a "mathematically precise test."  Abeita, 159 F.3d at 251. . . .  Conduct that is merely offensive is not actionable.  Harris, 510 U.S. at 21, 114 S.Ct. 367.  To be actionable, the harassment must consist of more than words that simply have sexual content or connotations.  Knox, 375 F.3d at 459-60 (holding that various comments and foul language were not severe or pervasive); see also Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998) (holding that plaintiffs must prove more than that a comment was tinged with offensive sexual connotations).  Instead, the workplace must be permeated with "discriminatory intimidation, ridicule or insult" sufficiently severe or pervasive to alter the conditions of employment.  Meritor Sav. Bank, 477 U.S. at 65-67, 106 S.Ct. 2399.  A nonexhaustive list of factors for the court to consider include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Jordan, 464 F.3d at 597 (quoting Harris, 510 U.S. at 23, 114 S.Ct. 367).

In reviewing these incidents, considering the totality of the circumstances, the Court does not find evidence sufficient to sustain a showing of a hostile work environment claim as it pertains to discrimination protected by Title VII.  Plaintiff alleges: that she received a lower-than-preferred performance evaluation, though one marked as fully satisfactory; that she was placed on telework during the investigation into her allegations toward her supervisor; that some of her supervisory training was delayed; that she was instructed not to speak to managers above the level of her supervisor; and that she opted to take a different job within DFAS that represented a promotion and explicitly required travel.

These allegations are not sufficient to warrant a finding of a hostile work environment within the standards established by <u>Harris</u>, <u>supra</u>, and <u>Faragher</u>, <u>supra</u>.  As this Circuit has recognized, reflecting the general judicial tenor that Title VII is not a "general civility code" for the workplace, "minor annoyances" such as those alleged in this matter, are not sufficient to create a legally cognizable hostile work environment. <u>Williams v. Gen. Motors Corp.</u>, 187 F.3d 553, 564 (6th Cir. 1999).[4]   Further, the Plaintiff's allegations do not specifically implicate, as they must, discrimination prohibited by Title VII.  These workplace conflicts do not amount to a hostile work environment

---

[4]Even were the Court to consider the allegations involving the January 2008 piano bar lap dance and the alleged remarks made by Mr. Glenn regarding Ms. Sikora, events outside the limitations period, the Plaintiff has still not established a hostile work environment claim.  Photographic evidence of the piano bar incident, along with Mrs. Lybarger's admissions during deposition, indicate a set of workplace colleagues fully engaged in the after-work endeavor.  In addition, while Mr. Glenn's alleged remarks concerning Ms. Sikora are clearly boorish, the behavior as testified to was few and far between such that it could not be found to create an objectively hostile environment.  <u>See</u> <u>Galeski v. City of Dearborn,</u> 435 F.App'x 461, 467-68 (6th Cir. 2011).

claim in the context of discrimination.  Accordingly, the Court will dismiss through summary judgment the Plaintiff's hostile work environment claim.

### IV.    CONCLUSION

For the reasons set forth above, this Court dismisses all of Mrs. Lybarger's claims against Defendant Robert M. Gates, Secretary, Department of Defense – DFAS.


IT IS SO ORDERED.

                               __/s/Lesley Wells_____
                                UNITED STATES DISTRICT JUDGE